**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **COLLECTOR'S COFFEE INC.,** aka **COLLECTOR'S CAFÉ INC.** (a Nevada corporation); | CIVIL ACTION No. |
| | |
| **MYKALAI KONTILAI (as Chief Executive Officer)** | **VERIFIED COMPLAINT** **BASED ON COUNTS:** |
| | |
| **MYKALAI KONTILAI (individually)** | **(1) NEGLIGENCE (MALPRACTICE, CONFLICT OF INTEREST);** |
| Plaintiffs, | **(2) NEGLIGENCE (MALPRACTICE, CONFLICT OF INTEREST);** |
| v. | **(3) NEGLIGENCE (MALPRACTICE, COMMITTING TO POSITIVE OUTCOME IN REPRESENTATION);** |
| **DEBEVOISE & PLIMPTON LLP** (a District of Columbia foreign limited liability partnership); | **(4) NEGLIGENCE (MALPRACTICE, FAILURE TO REVIEW DOCUMENTS);** **(5) BREACH OF CONTRACT;** |
| **ANDREW J. CERESNEY (as partner of LLP and individually),** | **(6) BREACH OF FIDUCIARY DUTIES;** **(7) FRAUDULENT CONCEALMENT;** **(8) FRAUD;** |
| **DUSTIN BROCKNER (as associate of LLP and individually)** | **(9) MISREPRESENTATION;** **(10) COURT-ORDERED INSPECTION;** **(11) ACCOUNTING;** |
| **MIHEER MHATRE (as associate of LLP and individually)** | **(12) UNJUST ENRICHMENT;** **(13) CIVIL CONSPIRACY;** **(14) INJUNCTIVE RELIEF.** |
| **and DOES 1 to 10** | |
| Defendants. | **(SUBJECT TO MOTION TO FILE UNDER SEAL)** |

**Preamble**

This is an action, based on the claims of malpractice and related causes of action. It is

brought by a Nevada corporation, Collector's Coffee Inc., its Chief Executive Officer Mykalai

Kontiai, acting in his capacity as a corporate officer, and by acting in his individual capacity as a

majority shareholder of that Corporation (about 70% stake). This action is brought against a law

firm, Debevoise & Plimpton LLP, its partner Andrew Ceresney, current associate Dustin

Brockner, and a former associate Miheer Mhatre. Having been retained under the Engagement Agreement of January 10, 2018, Defendants abysmally failed in their duties to represent Plaintiffs in a U.S. Securities and Exchange Commission investigation, undertook acts of concealment, fraud, and allegedly violations of law, causing damages of catastrophic nature to their former clients, effectively destroying the Corporation and its principal's life. See Exh. 1. Plaintiffs seek a judgment of forfeiture of all fees obtained by Defendants, and separately, both compensatory and punitive damages, injunctive and other relief for malpractice.

## I.   PARTIES.

1.      Plaintiff COLLECTOR'S COFFEE INC., aka Collector's Café Inc. (also Collector's Coffee or the Corporation), is a Nevada corporation, incorporated on November 1, 2007, entity No. E0754932007-3, Nevada ID NV20071411377, currently at the registered address 7424 W Sahara Ave., Las Vegas, NY 89149. Its corporate address was 566 Tam O Shanter, Las Vegas, NV 89109, at which the Engagement Letter was directed. Collector's Coffee is Plaintiff in this action because Debevoise & Plimpton and its attorneys failed to properly, diligently carry out their obligations, as a result of which Collector's Coffee has been ruined as a business wiping out a venture worth a minimum of $300 million. Over 200 investors in Collector's Coffee invested cumulatively over $20 million in that Corporation, now defunct, because of Debevoise & Plimpton's malpractice.

2.      Plaintiff MYKALAI KONTILAI (Kontilai), in his capacity as the current President, Chief Executive Officer, and the Director of Collector's Coffee, is a business executive. Kontilai was the founder of Collector's Coffee in 2007, having been its leader at all times. Debevoise & Plimpton's Engagement Letter of January 10, 2018, was addressed to Kontilai as the President and Chief Executive Officer, at the address: 566 Tam O Shanter, Las

Vegas, NV 89109.  In this matter, Kontilai's standing as the President and a Chief Executive are not merged into the rights of the Corporation, his rights and claims are distinguishable as those of an executive officer, who, in addition to his executive function, has a paramount responsibility and rights in the name of the Corporation, as the owner of about 70% of the Corporation's outstanding stock including all of its voting shares.  At the questioning of Kontilai by the U.S. Securities and Exchange Commission's (SEC) officers, in May of 2018 in Denver, Colorado, Debevoise & Plimpton acknowledged and admitted that, in addition to the Corporation, they represented Kontilai.  At present, Kontilai resides overseas.

3.      Plaintiff MYKALAI KONTILAI, as an individual, is a proper party, given his stake as a majority stockholder (about 70% of the outstanding stock) in Collector's Coffee, with the address 566 Tam O Shanter, Las Vegas, NV 89109.  Kontilai's claims as an individual are based on his being the majority stockholder at the Corporation.  In the course of questioning of Kontilai, in May of 2018 in Denver, Debevoise & Plimpton acknowledged and admitted that they represented Kontilai as an individual.  In 2018, Debevoise & Plimpton billed over a million dollars in fees to the insurance carrier QBE North America, for work on behalf of Kontilai as an individual.  At present, Kontilai is located overseas and has no employment due to the devastating damages caused by Defendants to his business and personal reputation.

4.      Defendant DEBEVOISE & PLIMPTON LLP (also Debevoise & Plimpton) is a foreign limited liability registered since 2004 in the District of Columbia, at the address 801 Pennsylvania Ave NW, Washington, DC 20004.  Its Washington D.C. office has about 30 attorneys.  Debevoise & Plimpton also has several other offices, including in New York City, London, Paris, Frankfurt, Luxemburg, Shanghai, Hong Kong, Tokyo, and Moscow.  Debevoise & Plimpton are Defendants in this action, because, having been retained on January 10, 2018, that law firm committed multiple acts of malpractice that ultimately led to the effective

3

destruction of Collector's Coffee and, essentially, ruining the life of Kontilai, who is currently overseas without employment, his assets having been frozen as a result of that malpractice.

5.     Defendant ANDREW J. CERESNEY (also 'Ceresney') is a partner of Debevoise & Plimpton.  Ceresney, who first joined Debevoise & Plimpton in 2003, rising therein to become a Co-Chair of the firm's Defense Litigation Group in Washington, D.C.  In 2013, Ceresney was hired by the U.S. Securities and Exchange Commission (SEC), where he worked for approximately the next 4 years, as the Director of Enforcement at the SEC, leading the Enforcement Division.  In that role, Ceresney oversaw approximately 1,400 SEC's Enforcement Division personnel, supervising law enforcement actions and investigations undertaken by the SEC. At the time of President Donald J. Trump's winning the Presidency in November 2016, Ceresney resigned from the SEC, having had a previously adversarial relationship with the newly elected President.  Ceresney, as reported in the media, deposed him in civil litigation earlier denigrating him in news articles as outlined in the media.  Ceresney returned to Debevoise & Plimpton where Plaintiffs here became in January of 2018 his first clients after the conclusion of Cerseney's one-year moratorium on representing anyone against the SEC. Ceresney is co-Defendant in this action because he committed acts of malpractice against his clients,.

6.     Defendant ANDREW J. CERESNEY is a Defendant in his personal and individual capacity because his negligent acts in the course of representing Plaintiffs were not only committed by him as a partner of Debevoise & Plimpton but also individually as an attorney licensed to practice law.   That has included allegedly, criminal acts and ethics violations of the Rules of Professional Conduct.  Some of the acts committed by Ceresney were undertaken in the course of that representation could have been beyond the scope of his responsibilities as a partner of Debevoise & Plimpton.

7.     Defendant DUSTIN BROCKNER (also Brockner) is an associate at Debevoise & Plimpton, with the office address(es) matching his law firm.  As an associate at Debevoise & Plimpton, Brockner was personally and deeply involved in the representation of Collector's Coffee and Kontilai under Ceresney.  Brockner is a Defendant for similar reasons as Ceresney.

8.     Defendant DUSTIN BROCKNER is a proper party in his individual capacity as an attorney at law, for the same reasons as Ceresney.  Brockner's residential address is unknown to Plaintiffs.

9.     Defendant MIHEER MHATRE (also Mhatre) is a former associate of Debevoise & Plimpton.  Mhatre is currently employed by the National Basketball Association (NBA) as an attorney.  As a former associate of Debevoise & Plimpton, Mhatre was personally involved in the representation of Collector's Coffee and Kontilai under Ceresney.  Mhatre is a Defendant for similar reasons as Ceresney and Brockner.

10.    MIHEER MHATRE is also a proper party in his individual capacity as an attorney at law, for the same reasons as Ceresney and Brockner.  Mhatre's residential address is unknown to Plaintiffs.

11.    Defendants JOHN DOES and/or JANES DOES are the persons working at Debevoise & Plimpton, not yet fully ascertained or known to Plaintiffs, who had acted to damage Plaintiffs in concert with the main wrongdoers, identified above.  Once Plaintiffs fully identify those individuals, they will be added as additional Co-Defendants.

## II. JURISDICTION.

12.    This court has jurisdiction in this action over Defendants and has jurisdiction to entertain all causes of action because all Plaintiffs are the citizens of the State of Nevada.  Debevoise & Plimpton is registered in the District of Columbia as a foreign LLP and conducts

regular business in the District of Columbia.  Individual Defendants are the citizens of the State

of New York and/or the District of Columbia.

13.     The Complaint satisfies the jurisdictional requirement of diversity of citizenship

and the statutory minimum amount of $75,000 of the claim under 28 U.S. Code § 1332.

14.     The venue is also proper because Defendants caused damages to Plaintiffs while

acting inter alia, in the District of Columbia.

### III.  FACTS RELEVANT TO ALL COUNTS OF CLAIMS.

### A.     CREATION OF COLLECTOR'S COFFEE.

15.     Kontilai founded Collector's Coffee on November 1, 2007.   Kontilai had a

successful career as a businessperson and entrepreneur in the Television Business News genre

and Instructional Television Industry (ITV) as well as other ventures. While at Collector's

Coffee, in 2010 Kontilai acquired the PBS Nightly Business Report (NBR), which was at the

time, America's Most Watched Daily Business News Program, and aired on PBS.

16.     For many years in the early 2000s, Kontilai's income routinely exceeded $1

million per annum.  Collector's Coffee was the first startup in his career where Kontilai raised

money from accredited investors using a Private Placement Memorandum (PPM).

17.     In the course of his successful business career, Kontilai developed valuable

contacts with prominent journalists, entrepreneurs, and investors.  That included his forming a

business partnership with legendary TV journalist Larry King (King) who was his Co-Host on

the TV Series "Collectors Cafe".

18.     King was also the brand ambassador for Collector's Coffee, with a TV Series

under contract about to run on the History Channel, a TV channel known and watched on cable

in many countries around the world.

19.     Kontilai established and created, among other things, important contacts with several Television Stations and Networks that leased thousands of his ITV programs mostly throughout the United States on Public Television for over a decade.

20.     Collector's Coffee was Kontilai's brainchild.  A revolutionary concept, that was going to establish America's first Lifestyle Collectibles Brand, integrating a social network with the world's first "Authenticity Insurance Policy" protecting collectors from fraud.  Such protection was to be underwritten by some of the world's leading insurance companies, including but not limited to, Lloyds of London (Hiscox), AIG, Liberty Mutual, Chubb, Navigator's, and C.V. Starr.

21.     Collector's Coffee originated from Kontilai's strategic business idea that most people collect during their lifetime, starting from their childhood.  Those collectible interests and hobbies remain and often expand throughout adulthood.  One way or another, the majority of all people collect something at some point in their lives.

22.     Collector's Coffee was to create a "One Stop Shop" where Collectors of all genres could meet and connect, as well as buy collectibles from hundreds of collectible dealers across the world in a marketplace with over a combined 6,000 categories and sub-categories.  Kontilai's strategy was to scale this enterprise through its acquisition of assets, in this prospective $350 billion collectibles marketplace and then sell the brand.

23.     Collector's Coffee was to be supported by numerous media drivers including an International TV Series airing on the History Channel, a Digital Television platform called Collectors Tube, a Blogger Network, and the world's only place to buy Authentic Collectibles underwritten by Authenticity Insurance of recognized insurance companies.

24.     Collector's Coffee was registered with the assistance of Robert K. Sparks (Sparks), an attorney licensed in the State of Nevada.  Since Collector's Coffee did not have

capital of its own, Kontilai loaned money to Collector's Coffee to start the Corporation, which, in turn, paid Sparks for his full-time legal services and his participation as an officer of the Corporation.

25.     Collector's Coffee secured in 2007 its initial television commitment from American Public Television to air its Collectors Cafe TV Series across public television stations nationwide.

26.     That major television distribution commitment resulted in the Corporation seeking a private valuation of the Corporation by the Micro Cap Valuation firm, Dutton, and Associates (Dutton).   Dutton assigned the valuation to Chartered Financial Analyst, Sally Wallick (Wallick), the former Head of Research at Legg Mason Investment Bank.

27.     After several months of research, Wallick submitted her report which valued Collector's Coffee at over $80 million principally based on the TV distribution commitment from American Public Television.

28.     As a result of that valuation, after Kontilai had funded the first year of the Corporation's expenses through his loans, Kontilai elected for the first time to invite private accredited investors to invest in restricted, non-voting, shares of the Corporation.

29.     Sparks represented to Kontilai and others at Collector's Coffee that he specialized in both corporate and securities law.   Kontilai tasked Sparks as in-house General Counsel, to prepare the PPM and all compliance documents, to present the package to selected investors.

30.     Private investments were to be materialized through the PPM and the Subscription Agreement along with other marketing materials prepared by Sparks, which were released in April 2008.

31.     Kontilai had known some of the early potential investors personally; they indicated their willingness to participate in Kontilai's new business project.

32.     Collector's Coffee was then on the path to financial success, focused on building intellectual property, a media-based, and collectible inventory asset portfolio that could be sold as a "Plug and Play" to a large corporation later on.  The strategic plan was to sell Collector's Coffee as a venture to a Fortune 500 entity that could use the Collector's Coffee platform as a "Plug and Play" for its existing customers, like Amazon or Alibaba. This could generate a return of multiples of the Corporation's initial investors on the PPM offering valuation of $50 million at $1.00 per share.

33.     By 2017, Kontilai mostly accomplished that goal, where he had built an asset portfolio comprised of filed pending business process patents for Kontilai's revolutionary Authenticity Insurance Invention, execution of a TV series contract with the History Channel (AETV, a Disney group of companies), a state of the art Web Portal, Registered Trademark Portfolio, Collectibles Dealer Portfolio, Digital Content Portfolio, and many other promotional and business accomplishments.

34.     This led to sophisticated investors starting to invest in the Corporation at a valuation of over $300 million ($6.00 per share), and institutional experts in Intellectual Property and Media, appearing in Digital TV programs at NASDAQ and the NYSE with Kontilai. Collector's Coffee had expressed interest from a bona fide multi-billionaire, Carlos Slim to invest in the Corporation after a private meeting with Slim.  Another notable financier, Maurice Greenberg, a former chairman of AIG, expressed interest in presenting the Corporation for sale to Alibaba and even drafted a contract to do so.

**C. ALLEGED BLACKMAIL LETTER FROM FORMER SEC ENFORCEMENT ATTORNEY.**

35.     On March 17, 2017, Collector's Coffee and Kontilai received, out of nowhere, a demand letter from attorney Timothy J. Dennin (Dennin), with offices in New York.  That letter

was presented to Kontilai in person in New York City along with investor Edwin J. "Skip" Mc Laughlin.

36.     Dennin wrote that he represented Blue Sunsets LLC (managed by Edwin J. McLaughlin) and Jencess Software and Technologies, Inc. who had invested into Series A Preferred shares of Collector's Coffee, investing $1,000,000 and $500,000, respectively.

37.     For purposes of obvious intimidation, Dennin wrote in the letter introducing himself: "For the past twenty seven years I have been representing investors who have been victimized by securities fraud. Prior to that, I was an attorney in the Division of Enforcement for the Securities Exchange Commission ("SEC") in Washington, D.C. and a former New York State Prosecutor."

38.     Dennin alleged violations by Collector's Coffee of the securities laws and demanded a payout within seven days of $1.5 million, with interest and attorney's fees, otherwise threatening various administrative and other complaints, including to the SEC, to be filed against Collector's Coffee and Kontilai.

39.     Kontilai undertook consultations in connection with that letter and received legal advice from his attorney at the time, Mark Hutchison (Hutchison), who served at a certain time as Lt. Governor of the State of Nevada.  Hutchison opined that the letter from Dennin, under Nevada Law, may likely be qualified as extortion.  It was calculated to destroy Kontilai's reputation, who was about to appear on the national television for his debut with Larry King on the Collector's Cafe TV Series.

40.     In Hutchison's opinion expressed to Kontilai, Dennin's letter likely violated the criminal laws of the State of Nevada (Nevada Revised Statutes, NRS) for extortion and/or blackmail.  Contacts regarding a potential settlement took place but were not leading to a quick resolution.

41.     Approximately two months later, on May 18, 2017, the action *Blue Sunsets LLC et al v. Kontilai et al*. 2:17-cv-01418, was filed in the U.S. District Court for the District of Nevada alleging unfounded securities fraud allegations.  That was the first time in nearly 12 years that the Corporation had ever been sued by any of its investors.

42.     Kontilai received phone calls from the History Channel through their production colleagues at Thinkfactory Media LLC, expressing their grave concern that such litigation would adversely affect the History Channel brand as well as the Collectors Coffee venture in the TV Series.

43.     Adam Reed, the President of Thinkfactory Media LLC, that produced the show in conjunction with Collector's Coffee, called Kontilai, and told him that unless that case were to be quickly settled, the History Channel would cancel the TV Distribution agreement with Collector's Coffee.

44.     The negotiations with Dennin on behalf of Blue Sunsets and another investor were resumed.  Because of the grave concerns from Dennin's prior actions, Hutchison suggested that Dennin should agree to personally sign the settlement agreement in his individual capacity.  As another condition, Dennin was to make assurances that he had not acted on his previous alleged illegal threats.  In addition, the settlement would be generally satisfied, with more than one payment installment.

45.     Dennin signed the settlement agreement with Collector's Coffee in his personal capacity, although he was not a party to the claims.  As the attorney for Blue Sunsets, he ended up being the recipient of the wire transfer payments. Installments per instructions of Dennin were paid by Collector's Coffee, for over 1 million dollars. The third installment was on the verge of being paid.

46.     On or about September 22, 2017, Kontilai received an urgent call from Sparks in Las Vegas, telling him that Collector's Coffee offices were served with about 10 Subpoenas from the SEC.  That meant that the SEC had launched a full investigation against Collector's Coffee and him personally.

47.     It became clear to Collector's Coffee and their counsel Hutchison, that Dennin allegedly had committed fraud in the inducement to trick Collector's Coffee into signing the settlement agreement, to unjustly enrich himself and his clients.  This must have occurred after Dennin had already followed through on his alleged extortion threats months earlier before the settlement agreement being executed.  Hutchinson sent to Dennin a letter outlining this alleged breach of contract.

48.     In discussions with the Board of Collector's Coffee, certain facts became self-evident.  Although Collector's Coffee had agreed to settle the claims, Dennin who was likely being compensated with a portion of the settlement may have already allegedly undertaken activities to cooperate with his former colleagues at the SEC, so he could more easily gain an unfair advantage in his lawsuit if a settlement did not occur. Dennin initiated a scenario for himself.

49.     All that allegedly resulted in the formal investigation by the SEC under the color of law through an alleged illegal enterprise with its former officer.  Some key verbiage in the subpoenas received from the SEC by Collector's Coffee and Kontilai, were strikingly similar or almost verbatim with the language used by Dennin in his lawsuit filed only months earlier. Allegedly, the SEC had used some of the work product organized by Dennin.

50.     Collector's Coffee and Kontilai retain attorneys to defend them against the investigation by the SEC.  That started with attorney Thomas J. Krysa (Krysa), and the law firm of Brownstein, Hyatt & Schreck LLP in Denver.  Krysa had worked as an Associate Regional

Director of the SEC's Denver Office and was a former prosecutor.  Krysa had reached, at a peak, a position of an Associate Regional Director in charge of enforcement and trials for the SEC's Denver Regional Office.

### D.  COMMENCEMENT OF DEBEVOISE & PLIMPTON'S INVOLVEMENT.

51.     Kontilai advised Krysa that he had begun to investigate Dennin informally as a journalist would, including speaking to a former Inspector General of the SEC.  That led to discovering, as Kontilai got convinced, that certain officers of the SEC were allegedly working with a number of its former enforcement attorneys who then became plaintiffs' attorneys suing companies and individuals for securities fraud and other related charges.

52.     Allegedly, such former officers of the SEC allegedly used their contacts at the SEC to request investigations be opened against their corporate defendants that they were suing to gain an unfair advantage in their respective civil cases.

53.      The SEC's investigations have had a crippling effect on many corporate defendants.  As the private investigation showed, with the cooperation of the SEC allegedly opening investigations, the former SEC attorneys would gain a heavy advantage in their civil cases.  As a result of that, such moves would likely result in quick settlements or summary judgments in their cases generating unreasonable profits for such former SEC Enforcement Attorneys and their law firms.

54.     As this came to light on such occurrences, the SEC's officers allegedly negotiated settlements with the same defendants, allegedly receiving for the SEC huge fines, disgorgements, and penalties while many corporations and investors were destroyed, wiping out businesses and ultimately causing harm to the certain sectors of the economy.

55.     Once Krysa was told about these serious allegations by Kontilai, he recommended that Kontilai seek a powerful former SEC Enforcement official, who could "handle this sensitive matter with the highest level of credibility within the SEC".

56.     Krysa recommended his friend Ceresney, who had shortly before he resigned as Director of Enforcement at the SEC, was now working at the powerhouse law firm, Debevoise & Plimpton. As mentioned above, Ceresney worked from 2013 to 2017, occupying the highest positions within the SEC's Enforcement Division.

57.     On or about December 20, 2017, Kontilai and Krysa had a three-way conference call with Ceresney on the telephone. Ceresney expressed serious interest in the case but confirmed that he was not free to start representing clients against the SEC until the next month, January of 2018.

58.     In that conference, Ceresney was advised by Kontilai of his potential findings related to the SEC and former enforcement agents of the SEC.  Ceresney stated to Kontilai and other witnesses, that retaining him and his law firm, Debevoise & Plimpton, which was expensive, would result in a favorable result within the next 6 months, for Collector's Coffee and Kontilai, provided Collector's Coffee was cooperative and allowed Ceresney to use his expertise to resolve the matter.

59.     Ceresney also proposed that he would be representing not only the corporation, but Kontilai individually and also almost every important corporate officer therein, including Kontilai and the former Board Chairman Gail Holt (Holt), former VP of Investor Relations David Chapman (Chapman), Chief Dealer Officer Peter Siegel, and former Director of Investor Relations Lilibeth Feliciano.

60.     Ceresney made it clear to Kontilai in more than one conversation in early 2018, that by representing almost all officers and directors he could control the narrative of the investigation and keep Kontilai out of harm's way.

61.     Ceresney did not advise Kontilai of significant potential conflicts of Kontilai with most all those former Directors and Officers.

62.     The Engagement Letter was prepared, on information and belief, by Ceresney, on the letterhead of Debevoise & Plimpton, and was addressed to Kontilai as the President and the Chief Executive Officer of Collector's Coffee.  See Exh. 1.

63.     The Engagement Letter left it unclear, who were exactly the clients, leaving Kontilai to understand that he was a party to the contract in his personal capacity as he was the main target of the investigation.

64.     Ceresney created that ambiguity specifically, namely, so if Collector's Coffee would become insolvent, Debevoise & Plimpton could be still in a position to go for collection of their legal fees after Kontilai as an individual.   Debevoise & Plimpton never sent any correspondence to Kontilai of any kind advising him that they did not represent him in his individual capacity.

65.     On January 10, 2018, Debevoise & Plimpton with Ceresney obtained the execution of the Engagement Letter by Kontilai, and it came into force.  See Exh. 1.

66.     The main terms of the Engagement Letter were as follows.  "Debevoise were to "represent Collector's Coffee, Inc. (the "Corporation") in connection with an investigation being conducted by the U.S. Securities and Exchange Commission (the "Investigation")".

67.     Ceresney was to be personally the lead counsel, namely "I will lead the firm's work in this matter.  The number of additional attorneys and support personally working on this matter may vary according to the scope and demands of the Investigation".

15

68.     Ceresney's rate was cited as $1,500 per hour, belonging to the top tier of any attorneys' rates in the U.S.  Ceresney emphasized to Kontilai and later his attorneys Hutchison, Robert Heim (Heim), and Ty Sagalow (Sagalow), that he had the high-level contacts at the SEC.

69.     Ceresney repeated represented to Kontilai, Heim, and Sagalow that Collector's Coffee issues would be quickly be resolved within 6 months if Collector's Coffee and Kontilai cooperated and testified in front of the SEC.

70.     In the real-life, such an extraordinary rate of legal fees gives the impression that a component of that exceptional rate was Ceresney's having accumulated the highest level contacts at the SEC when he was working in the SEC as its Director of Enforcement.

71.     The Engagement Letter required a retainer of $75,000 and mentioned that Collector's Coffee was expecting that the insurance carrier would cover most of the costs of defense under the Company's Director's and Officer's Insurance Policy.

72.     Ceresney repeatedly assured Kontilai at the beginning of 2018, with the attorney witnesses present, that it would take him only about 6 months to resolve the issues with him, Collector's Coffee, and the SEC.

73.     Collector's Coffee and Kontilai was to respond to the SEC's Subpoenas. Ceresney and Debevoise & Plimpton were fully responsible for compliance on a "rolling schedule".

74.     Hundreds of thousands of documents were submitted by Collector's Coffee and Kontilai to Debevoise & Plimpton, which, in its turn, were delivered to the SEC's regional office in Denver, Colorado, in response to those SEC Subpoenas.  Debevoise & Plimpton did not set an exact schedule for work with the Collector's Coffee clients, but personal meetings and direct communications by phone were regular and often.

75.     Ceresney represented not only the Corporation but also most of its current and former officers and directors, including Kontilai and Holt, the former Chairman of the Board. Thereby neither Debevoise & Plimpton nor Ceresney asked any of the Corporation's officers about waivers of conflict of interest except Chapman, that would have been typically required for representing a corporation, with a distinct likelihood that some clients could be or become adversarial to Collector's Coffee and Kontilai.

76.     As it turned out, Debevoise & Plimpton and Ceresney engaged in malpractice, when they started representing both the corporation and nearly all of the relevant officers and the former members of the Board at the same time.

77.     The members of the Board and, notably, Holt had serious conflict potential. Chapman's name was already integrated into the lawsuit filed by Blue Sunsets LLC, and a diverse and distinct conflict of interest already existed for his previous conduct.

78.     Thus Debevoise & Plimpton should have never agreed to represent Holt and Chapman, despite including some conflict language in Chapman's Engagement Letter, where Chapman already had distinct conflicts of interest with both Collector's Coffee and Kontilai as those arose from the Blue Sunsets LLC lawsuit.

79.     Collector's Coffee and Kontilai were extremely surprised with the amounts in the first invoice and the subsequent invoices from Debevoise & Plimpton at some points exceeded $600,000 a month.  Ceresney routinely explained to Kontilai and his attorneys, that their invoices were so high because they reviewed every page of every document in the case to make sure no mistakes would ever be made.

80.     Ceresney also routinely continued to assure Kontilai that his contacts at the SEC were at the very highest levels and that the current Co-Directors of Enforcement Stephanie Avakian and Steven Peikin at the SEC, had worked directly under Ceresney's supervision over a

year earlier. Cerseney stated that he would be dealing with his former subordinates and reconfirmed that within 6 months that the SEC's investigation would be resolved favorably.

81.    The insurance carrier of Collector's Coffee, QBE North America, through their Vice President John Culotta, refused to pay the full amount of Ceresney's $1,500/hour rate, even when Ceresney agreed to reduce it to $1,300/hour. Collector's Coffee had to cover the difference from its assets, in the hope that after such large outlays for 6 months, its corporate life would resume normal expecting the investigation to be resolved, as Ceresney was promising.

### E.  INCIDENT WITH DOCUMENTS GENERATED BY GAIL HOLT.

82.    The SEC scheduled Kontilai's deposition at its Regional Office in Denver, Colorado, on May 16, 2018.  Ceresney directed Kontilai to spend a week in New York before deposition in Denver, with tentative questioning.  Kontilai complied.

83.    Kontilai was being prepared by Ceresney as the lead counsel and two associates, Brockner and Mhatre.

84.    On or about May 11, 2018 (Friday), Kontilai was asked at Debevoise & Plimpton's office to obtain additional responsive documents relating to the SEC's Subpoenas that were missing, including his employment contract from 2007, prepared by Holt at that time.

85.    Kontilai advised Ceresney that he did not have those documents in his possession any longer.  Ceresney asked Kontilai who might have those documents. Kontilai advised Ceresney that Holt had created those documents during her time on the Board in 2007-2008 and that the attorneys may want to ask her as their client.

86.    Ceresney directed Kontilai to contact Holt by phone and ask her to send any documents she had in her possession from her time on the Board but specifically stated to Kontilai: "don't discuss any details, just ask her to send to you what she has".

87.     Kontilai trusted Ceresney as his attorney, though was wondered why Ceresney would not call his client Holt and ask for those documents, including the employment contract from 2007.

88.     Ceresney committed malpractice by putting Kontilai, his client, in harm's way by directing him to contact Holt who was a potential witness in the case.  That way Ceresney created a situation when Kontilai could be accused later of witness tampering should Holt become adverse to Kontilai.

89.     Kontilai called Holt and followed Ceresney's instructions asking her to send him in New York by overnight mail any documents that she could find that she had in her possession from the time in 2007-2008 when she served on the Board of directors.

90.     Holt confirmed to Kontilai in a brief statement that she did and that she would overnight Kontilai what documentation she had in her possession.  Brockner according to Holt in her civil deposition later in October 2020, also followed up with Holt via emails and possibly phone calls relating to the same documents, namely after Holt confirmed she had some documents in her possession.

91.     On or about the morning of May 14 (Monday), 2018, a package from Holt was delivered to Kontilai. Without opening it, Kontilai emailed Debevoise & Plimpton advising them that Holt's documents had arrived.  Debevoise & Plimpton advised Kontilai that it would send the firm's courier to pick up the package at Kontilai's unit at 1 Central Park South, NY, 10019.

92.     As it turned out, rather than closely reviewing those documents as was their responsibility to do on behalf of Kontilai and Collector's Coffee, or contacting Holt, their client, and asking her any questions about the documents, she had sent, Debevoise & Plimpton did neither, committing malpractice.

93.     In a rush to comply with subpoenas, Debevoise & Plimpton and its attorneys likely did not even review the documents or even question Holt, and immediately sent those documents to the SEC's office in Denver, Colorado as additional original documents, without proper review or possibly no review at all as the Kontilai deposition was only a couple of days away.  By sending unreviewed documents to a government agency and presenting those as additional originals, Defendants committed malpractice.

94.     That catastrophic mistake by Debevoise & Plimpton, Ceresney, and the associates Brockner and Mhatre, the legal team representing Collector's Coffee and Kontilai, would lead to a tragic turn of events that would destroy the Corporation and Kontilai.

95.     At no point in time on May 14, 2018, or in subsequent months leading up to August 1, 2018, Kontilai was not informed he was authorized to open the package and review the documents received in the package from Holt in Las Vegas.  Kontilai was completely unfamiliar with the contents.

96.     In the mindset of Kontilai, the installment of documents transferred by Debevoise & Plimpton to the SEC as original documents did not appear to be anything out of the ordinary business documents because dozens of installments of documents had already been transferred from the offices of Collector's Coffee to Debevoise & Plimpton in prior months.

97.     On May 16, 2018, Kontilai arriving at the SEC's office in Denver, was struck by how friendly Ceresney was with Mary S. Brady (Brady), the lead supervisor in his case.  It appeared they had known each other for years.  Ceresney gave Brady a kiss on the cheek with a long embrace, as they met before the questioning of Kontilai.

98.     The questioning of Kontilai at the SEC's office on May 16-17, 2018 went remarkably well, as Ceresney told Kontilai after a two-day round of questioning.  Those present at Kontilai's questioning included the SEC's officers Brady, investigator Jacqueline Moessner

(Moessner), a court reporter, and Kontilai's counsel Ceresney, Brockner, and Mhatre, all in the room together.

99.     After the questioning, Ceresney complimented Kontilai with a strong performance, his straightforward answers, his composure, and his self-confidence.  In Ceresney's words, Kontilai's performance was excellent, "an A Minus and he does not give A's".

100.    Ceresney said to Kontilai in a private room nearby "this investigation is over, congratulations".   The legal team celebrated after the testimony was over.  Ceresney assured Kontilai that now the settlement with the SEC was certainly in the coming and on a quick path.

101.    Proposed settlement agreements drafts began to be exchanged between Debevoise & Plimpton and the SEC's office in Denver, Colorado, but with slow progress.

102.    In light of the extraordinary invoices coming from Debevoise & Plimpton, Collector's Coffee and Kontilai had previously hired two attorneys Sagalow and Heim, to monitor the activities and the billing of Debevoise & Plimpton, and to hold that law firm and Cerseney to the timeline they had promised. Those two outside attorneys, mentioned above, Sagalow and Heim, were to monitor the billing and to monitor Debevoise & Plimpton's work and see that the anticipated settlement would be executed.

103.    However, little new was coming from the SEC's office in Denver, and no acceptable proposal of a settlement in line with what Ceresney had promised was in progress.  On the contrary, the SEC was being more difficult than expected, attempting to have Kontilai listed as an individual in a proposed settlement which would become devastating to Kontilai's reputation.

104.    Over time, the 6-month time frame promised by Ceresney for resolution of the claims was long expired.  Instead, only large invoices continued to be sent to Collector's Coffee and Kontilai.

105.     In June and July of 2018, Kontilai and other representatives of Collector's Coffee, including Sagalow and Heim, started to ask Ceresney and other attorneys at Debevoise & Plimpton why the matter had not been closed and settled, at the expiration of 6 months, as Ceresney had promised.

106.     The questions repeatedly posed to Debevoise & Plimpton were becoming more insistent but without clear answers.  Ceresney repeatedly stalled and responded that he should not push for settlements with his former subordinates and he did not want to create an appearance that he was looking for special treatment.

107.     Kontilai and the attorneys repeatedly reminded Ceresney of the promises that he had made, but Ceresney advised him not to worry, that he was in charge and he would get the job done.

**F. DISCOVERY THAT GAIL HOLT'S DOCUMENTS WERE NOT ORIGINAL.**

108.     In the very early hours on August 1, 2018, Ceresney called Kontilai by phone, in an agitated manner, delivering what he called "shocking news" to Kontilai.  As it turned out, some of the original sets of the documents provided by Holt and delivered to the SEC on or about May 14, 2018, were recreated documents, not the original sets from 2007.

109.     One of the pages among those documents from Kontilai's Employment Agreement contained a printed date stamp that it was generated in 2018.  Ceresney anticipated an extremely difficult situation with the SEC relating to those pages because an act of intentionally providing false originals to a federal agency could be construed under the Obstruction of Justice Chapter against him and his law firm which had a multi-million dollar annual practice in place practicing in front of the SEC (including under 18 U.S.C. Sec. 1512).

110.     In addition, Debevoise & Plimpton, Ceresney, Brockner, and Mhatre were likely aware that they had committed malpractice by not reviewing those important documents properly, as missing that obvious date stamp was irrefutable, thereby putting clients Holt and Kontilai in possible jeopardy.

111.     As the former Director of Enforcement of the SEC, Ceresney, as well as associates Brockener and Mhatre of all people, should have followed proper protocols and procedures and communicated with Holt directly to understand what documents Holt had sent. Ceresney, Brockner, and Mhatre abysmally failed to do that. He had his professional reputation on the line now also.

112.     In that night-time or early morning conversation, Kontilai responded to Ceresney he was completely unaware of what Ceresney was talking about, that he received and transferred Holt's package to Debevoise & Plimpton, unopened, on or about May 14, 2018, without knowledge of its contents. Despite the night-early morning hours, Ceresney demanded to call Holt immediately while Kontilai stayed on the phone, on hold.

113.     Holt reportedly answered the call on August 1, 2018, in those early hours from what Kontilai believed was her Las Vegas residence.  Ceresney and Holt spoke for nearly 30 minutes while Kontilai remained on hold.

114.     According to Holt's subsequent deposition, Ceresney demanded from Holt to explain Kontilai's Employment Agreement, delivered from Las Vegas to Kontilai's address on May 14, 2018.  Ceresney specifically indicated that Kontilai's Employment Agreement was not the original document as he had assumed.

115.     Holt reportedly confessed to Ceresney, explaining later to Kontilai after coming back on the line with Kontilai.

116.   Holt then admitted that she innocently could not find the original Employment Agreement from 2007 (11 years earlier) and that she only recreated that same document to be helpful.

117.   As Holt later explained, she was not advised by Ceresney or anybody at Debevoise & Plimpton that the documents were being sent to the government's office.

118.   Holt reportedly thought it was acceptable that she recreated the employment contract of Kontilai's from 2007 for the file, because it had existed and was executed years earlier, but could not be found in the corporate documentation.  Holt recreated it as though it were an original set.  Holt then confessed that all this was her initiative and that Kontilai had no part in it.

119.   As a result of that discovery, Ceresney, Brockner, Mhatre, and Debevoise & Plimpton had two choices. First, they could immediately disclose to the SEC what had happened, terminate their representation of Collector's Coffee and Kontilai, resigning immediately, but at the cost of foregoing future cash flow deriving from the lucrative engagement with Kontilai and Collector's Coffee.  Alternatively, Ceresney, Brockner, Mhatre, and Debevoise & Plimpton could resign, immediately, from representing these parties without disclosing anything to the SEC, but, also, at a cost of losing the lucrative engagement with Collector's Coffee and Kontilai.

120.   Debevoise & Plimpton, Ceresney, Brockner, and Mhatre did none of the above and began to engage in a series of unethical and possibly illegal conduct to preserve their "gold standard" reputation, continue receiving lucrative monthly fees, and seeking to avoid a potential malpractice suit.

121.   For Ceresney, Brockner, and Mhatre, that choice was apparently to avoid what might be considered collectively, a career-altering mistake that could have a very negative

impact on their professional reputations and adversely affect their professional future.   For Cerseney the stakes were higher, as he had political ambitions with the SEC or other government posts which he was well-positioned to receive in the forthcoming years.

122.    Debevoise & Plimpton concluded that they may not represent Holt any longer. As the true wrongdoer with the documents, she was now averse to Collector's Coffee and Kontilai.  Ceresney advised Holt that they were to terminate her representation.  Ceresney asked Collector's Coffee attorney Sagalow if he would participate in a joint call with QBE North America, to ask that the insurance carrier find a replacement attorney for Holt.  That call was then placed and executed.

123.    The insurance carrier approved that, without the benefit of the knowledge that Ceresney, Brockner, and Mhatre had committed malpractice on multiple occasions.  William Leone (Leone), a former U.S. Attorney for the District of Colorado at the law firm Norton, Rose, Fulbright was retained to represent Holt as her new attorney replacing Debevoise & Plimpton and Ceresney.

124.    Despite the liability, inter alia, under 18 U.S. Code Sec. 1512 and under other statutes concerning fraud on a federal government agency and tampering with evidence and the serious risk to Ceresney, Brockner, Mhatre and Debevoise & Plimpton in not executing one of these ethical options, Ceresney, Brockner and Mhatre allegedly decided to concoct a scheme. Defendants intended to mislead the SEC with a plan to avoid damages on behalf of Debevoise & Plimpton, and Ceresney, Brockner, and Mhatre personally.

125.    After the discovery on August 1, 2018, Ceresney, Brockner, Mhatre, and Debevoise & Plimpton continued to bill for their work and involvement for August, September, and more than half of October of 2018.  That translated into the additional invoices exceeding, on information and belief, over $1 million.

25

126.    Ceresney explained to Kontilai, Sagalow, and Heim that he had a plan on how to handle with the SEC the issue of discovering the non-original Employment Agreement without damaging the pending settlement with Collector's Coffee and Kontilai.  According to Ceresney, there was no cause for concern, the settlement negotiations with the SEC should continue uninterrupted, without the disclosure of the non-original employment agreement until much later.

127.    Ceresney assured Kontilai, Sagalow, and Heim that it was ethical and legal to disclose that document on or around the actual date that the execution of the future settlement agreement with the SEC.  According to Ceresney, that was because the SEC would want to close the matter with the settlement agreed to, and the SEC would believe Ceresney's disclosure of Holt's error was her own honest mistake without any intent to defraud the SEC.

128.    Kontilai was not asked for his own opinion nor did that matter to Debevoise & Plimpton with Ceresney having left the SEC less than two years earlier.

129.    On or about October 18, 2018, Ceresney and Leone then arranged a joint phone call with the SEC to finally disclose that the Employment Agreement was not an original.  In that call, as Kontilai was advised, Leone began disclosure to the SEC's investigators Brady and Moessner.  Kontilai was later advised that Moessner and Brady's immediate reaction was that they were alarmed as they began to ask many questions.  Ceresney remained mostly silent, quickly questions turned to a hostile mode.

130.    In the course of that conference, rather than speaking up and advising the SEC that Kontilai and Collector's Coffee had nothing to do with that mistake, Ceresney concealed that had interviewed Holt on or about August 1, 2018, and that the Employment Agreement document that was recreated solely by Holt.

131.     Ceresney left his clients Collector's Coffee and Kontilai looking complicit in the scheme admitted by Holt as the sole actor.  That left the SEC's officers, through his silence, to conclude that probably Kontilai and Collector's Coffee had also been involved.

132.     Brockner and Mhatre also violated their ethical obligations to their clients Collector's Coffee and Kontilai by remaining silent and not reporting this fraud to the SEC. This was also direct malpractice and unethical conduct.

133.     That concealment of the fact that Kontilai and the Corporation were innocent was an intentional, purposeful omission by Ceresney for Debevoise & Plimpton's Ceresney's, Broackner's and Mhatre's self-preservation of their reputations and exposure to malpractice claims.

134.     The SEC's officers Moessner and Brady quickly stated that the settlement was off the table and that they were going to expand their investigation against Collector's Coffee, Kontilai, Holt, and even their family members.

135.     Shortly thereafter, the SEC proceeded to issue a new series of Subpoenas against Kontilai, Holt, and their spouses.  Ceresney's, Brockner's and Mhatre's posture in not advising the SEC of the truth was a blatant manifestation of negligence and malpractice, resulting in irreparable harm to Collector's Coffee and Kontilai.

136.     Ceresney and Debevoise shortly thereafter resigned by a text message by notifying Kontilai that they could no longer represent him or Collector's Coffee leaving both parties in a devastating, helpless position.

137.     Ceresney's, Brockner's, and Mhatre's malpractice and their intentional omissions of key evidence regarding Holt which, as they were fully aware, exonerated Collector's Coffee and Kontilai, led to a criminal referral against Kontilai to the U.S. Department of Justice by the SEC.

138.    That malpractice at Debevoise & Plimpton led to the convening of two separate grand juries to consider charges against Kontilai.  That malpractice also resulted in the SEC's civil complaint against Collector's Coffee and Kontilai in May 2019. Ultimately, Kontilai was forced to seek asylum in the Russian Federation to preserve and protect his freedom and safety, out of sheer necessity.

139.    About 2 months later, Holt fired her attorney Leone for alleged misconduct advising the insurance carrier that Leone was pressuring her into making up a story to try to implicate Kontilai in the recreation of the employment agreement.  Holt advised a witness that Leone was pressuring her, that her family counsel insisted she only communicates with Leone in writing.

140.    When the pressure would not stop, Holt contacted QBE North America (QBE) and complained of these acts. QBE immediately approved Leone be fired.  Holt fired Leone in a letter indicating that his illegal acts were the basis for his termination.  Holt then hired Susie Youn (Youn) of the law firm Wilson Spadafora, a former SEC enforcement attorney in Denver, a colleague of Brady, the supervisor in charge of the Collector's Coffee and Kontilai investigation.

141.    Youn requested Holt to participate in an interview in New York, in front of Collector's Coffee attorneys under a JDA (Joint Defense Agreement) from the law firm Baker Hostetler.  Patrick Hannon, John Carney, and Douglas Greene and Kontilai's criminal attorneys Edward J.M. Little and Miles Orton were present at that meeting.

142.    At that interview, Holt repeated the story that she thought she could not find the original set of Kontilai's Employment Agreement and other documents from 2007.  Holt thought it was a good idea for her, as the former Board Chairman, just to recreate those anew, which she did. Those statements were later corroborated by Holt under oath, in a deposition in October 2020.

143.    Consequently, Holt admitted in that interview with Kontilai's attorneys that she introduced into the legal proceedings a whole host of other documents that were not genuine that she recreated or fabricated and that she directed her attorney Leone and others to intentionally lie to the SEC.

144.    Holt then later admitted in an affidavit in a civil lawsuit brought against Collectors and Kontilai by the SEC, that she had indeed intentionally knowingly committed numerous crimes including embezzling millions of dollars from Collector's Coffee.

145.    In the opinion of Kontilai, the SEC's officers decided very early on that they wanted only Kontilai as a target to be convicted, in retaliation for the information he had uncovered regarding the alleged illegal enterprise among the certain former officers of the SEC and the SEC's officers.  The SEC rewarded Holt, on information and belief, with a proffer immunity deal.

### G. SUBPOENA ON DEBEVOISE & PLIMPTON, POSSIBLY ACTING AGAINST FORMER CLIENTS.

146.    On information and belief, Debevoise & Plimpton have been subpoenaed in two grand jury proceedings, to produce documents and to testify against Plaintiffs in this action.  On information and belief, Ceresney may have testified against his former clients.

147.    The government designated Kontilai as a "target", accusing him of making false statements, obstructing an official proceeding, and falsifying records in a federal investigation, in violation of 18 U.S.C. Secs 1001, 1512, 1519.

148.    None of those allegations had any basis in the fact, because Kontilai had not participated in Holt's "recreating" the old original documents which Holt admitted, time and time again, to at least 10 witnesses, nearly all attorneys.  Kontilai had never requested Holt to do any of those things and was unaware of what Holt did, which was corroborated by the fact that Holt repeatedly admitted her wrongdoing in front of various attorneys, including her attorneys.

149.    The government (DOJ) proceeded in the District of Columbia under the extremely rare 'crime-fraud' exception to the attorney-client privilege, even though Kontilai was innocent, at all times and the events had taken place well before.  If Kontilai had an opportunity to provide evidence, that exception should not apply.

150.    On information and belief, Debevoise & Plimpton and Ceresney started to produce documents covered by the attorney-client privilege.  However, the true volume of the privileged documents, released by Debevoise & Plimpton to the government, is not yet known.

151.    It is also not known if the release of the documents was followed by the oral testimony of Ceresney as the witness.   Kontilai believes, based on the totality of the circumstances, that such testimony has also taken place, in the course of the grand jury proceedings in Washington, D.C., where he was the target.

152.    Even though the grand jury proceedings in Washington D.C. were in progress, on information and belief, the government initiated a new round of grand jury proceedings against Kontilai in the District of Nevada, in Las Vegas in 2020, his home city. A duplication of the grand jury proceeding is almost unprecedented.

## H. DESTRUCTION OF COLLECTOR'S COFFEE, ANNIHILATION OF ITS MARKET VALUE THROUGH NEGLIGENCE OF DEBEVOISE & PLIMPTON.

153.    The failure of the anticipated settlement on October 18, 2018, meant that the Corporation, Collector's Coffee, lost its future, being plagued with anticipation of further proceedings by the SEC in a new civil lawsuit, and the criminal case being pursued by the U.S. Department of Justice.  That was aggravated by the press releases of the SEC, destroying the most promising venture of Collector's Coffee and Kontilai personally.

154.     Before the SEC's Subpoenas, the market value of Collector's Coffee could be valued by using at a minimum, as the benchmark the latest price paid for the shares by institutional and sophisticated accredited investors, to acquire the stake in that Corporation.

155.     If that latest benchmark were converted into the market value estimate, then the market value of Collector's Coffee was at a minimum $300 million, due to its unique assets and contracts to air on TV through the History Channel.  That valuation surpassed the latest valuation of the CFA by a multiple of approximately 4 times (that showed the Corporation's previous market value in 2007 at about $80 million)

156.     As mentioned above, Collector's Coffee was on the verge of efforts to be sold, which would leave all shareholders personally enriched by early entry into the Corporation's equity.

157.     Debevoise & Plimpton's legal fees for January to October of 2018, exceeded $3 million, for their attempted legal representation of Collector's Coffee, Kontilai, and other corporate officers. As a result of their representation, their misconduct, and alleged illegal activities Collector's Coffee and Kontilai were doomed, as the Corporation was destroyed.

158.     Debevoise & Plimpton, by their actions or their failure to act for the clients, presided over the destruction of the Corporation which they were supposed to represent, annihilating its market value and its future profits projections.

159.     On or about May 15, 2019, the SEC filed in the U.S. District Court for the Southern District of New York a lawsuit, captioned *U.S. Securities and Exchange Commission v. Collector's Coffee et al*., Docket 19-cv-04355. The lawsuit was commenced with an Ex Parte Temporary Protective Order against Kontilai, that was issued without a hearing.

160.     That lawsuit, pending, represented a final blow to the aspirations of Kontilai and 200 investors that Collector's Coffee could be sold, the Corporation became essentially inactive.

## I.  BECAUSE OF NEGLIGENCE OF DEBEVOISE & PLIMPTON, KONTILAI'S PERSONAL LIFE WAS DESTROYED.

161.    As mentioned above, the disastrous break-down of the settlement negotiations in October of 2018 due to Ceresney's malpractice and his allegedly illegal activities represented a massive personal exposure of Kontilai, whose cherished business enterprise now laid in ruins.

162.    Kontilai developed fears that he had gained powerful enemies in Debevoise & Plimpton and their contacts within the SEC and the government, who could be interested in his physical elimination.  Kontilai left the U.S. for Canada and later for Europe, ultimately to Russia, where he has been seeking asylum, by the necessity of being fearful for his life.

163.    Based on his life experience, Kontilai believes that if he returns to the U.S., he will be killed even at the time of detention before a chance of a fair trial.

164.    Furthermore, upon a request from Collector's Coffee and Kontilai, through their attorneys, to transfer the clients' file to Collector's Coffee's and Kontilai's new attorneys, Debevoise & Plimpton refused on the pretext that not all of their legal fees were paid.

165.    As a result, Plaintiffs had a considerable problem with discovery in the SEC's civil action. Almost a year after Collector's Coffee and Kontilai requested their files, Debevoise & Plimpton finally stipulated to a Court-approved order and sent the files, in installments, claiming those were complete in October 2020.

## COUNT I. NEGLIGENCE (MALPRACTICE, OVERCOMING CONFLICT OF INTEREST).
### (Against Defendants Debevoise & Plimpton and Ceresney)

166.    Plaintiffs incorporate by reference the allegations in preceding Paragraphs 1-166, with the same force as though repled again and further state as follows.

167.   All four elements of legal malpractice were satisfied here: (a) existence of an attorney-client relationship, (b) negligence by the attorneys of the law firm, (c) losses and/or injury to the clients caused by the negligence, and (d) financial loss or injury to the clients.

168.   Here, legal malpractice satisfies the test "but for" the attorney's negligence ("but for" causation).  If not for Debevoise & Plimpton's malpractice, Plaintiffs would have settled the SEC's claims, the business valued from $80.0 million to $300 million would have survived and flourished, it would have been sold with a return of a massive profit.  If not for Debevoise & Plimpton's malpractice, Kontilai would have continued his life as a successful entrepreneur, managing multiple projects under the brand of Collector's Coffee, including on the national TV channels.

169.   From the first conference that Plaintiffs had with Debevoise & Plimpton on or about December 20, 2017, and through the execution of the Engagement Letter on January 10, 2018, Debevoise & Plimpton, Ceresney, Brockner and Mhatre had a thorough opportunity to review all documents submitted to them by Kontilai and Collector's Coffee.  That was the duty of Debevoise & Plimpton, Ceresney, Brockner, and Mhatre as counsel to both Kontilai and Collector's Coffee, undertaken along with assuming the counsel's responsibility for representing the Corporation and all its officers.

170.   Even if Debevoise & Plimpton and Ceresney, Brockner and Mhatre did not review the documents or undertake an investigation, it must have been obvious for any diligent attorneys that representing simultaneously a corporation and its officials and members of the Board was inherently risky for conflict of interest, especially knowing that Chapman was already conflicted as evidenced in the Blue Sunsets LLC lawsuit in Las Vegas.

171.   Despite that, Debevoise & Plimpton and Ceresney obtained an engagement as to the joint representation of multiple parties, the Corporation, and its officers, failing to recognize

or intentionally ignoring the existence of the conflict of interest among the officers of the Corporation.  The ignorance of the conflict was driven by the objective to bill more hours and get larger monthly legal fees.

172.    Additionally, in a haste to have the Engagement Letter executed and the retainer of $75,000 paid, Debevoise & Plimpton and Ceresney did not require, out of extra diligence, from most of the Corporations' officers and members of the Board to execute waivers of conflict of interest.

173.    Even subsequently, when the conflict of interest became overwhelming obvious, Debevoise & Plimpton and Ceresney still did not comply with the standard procedure to ask all the conflicted or potentially conflicted clients to execute the necessary waivers.

174.    The motive for such a clear disregard of the prohibitions under the Model Rules of Professional Conduct (including but not limited to Rules 1.7 and 1.8), was pecuniary gain when a law firm and its partner weighed monetary considerations above their professional obligations to their Clients Collector's Coffee and Kontilai.

175.    Plaintiffs are entitled to relief, compensatory and punitive damages based on the damages suffered due to this conflict of interest, resulting in damages, as shown above.


**COUNT II.  NEGLIGENCE (MALPRACTICE, CONFLICT OF INTEREST OF CERESNEY WITH FORMER EMPLOYER SEC).**
**(Against Defendants Debevoise & Plimpton and Ceresney, Brockner, and Mhatre)**

176.    Plaintiffs incorporate by reference the allegations in preceding Paragraphs 1-166 and 167-168 (elements and causation), with the same force as though re-pled again.

177.    From the first conference that Plaintiffs had with Debevoise & Plimpton on or about December 20, 2017, and through the execution of the Engagement Letter on January 10, 2018, Ceresney and Debevoise & Plimpton made it clear that they had excellent contacts at the

highest levels of the SEC, Ceresney's former employer, and that he was confident that he could achieve a quick settlement within 6 months.

178.    The assertions by Ceresney, of Debevoise & Plimpton, that they had some special or exclusive treatment at the SEC was implied as a justification of the extraordinary hourly rate billed by Ceresney personally ($1,300/hr) and by his associates at the law firm.

179.    As a result of Debevoise & Plimpton's using implied leverage of connections at SEC, that firm's invoices from January to October of 2018 amounted to over $3 million.

180.    However, Ceresney's connections with the SEC, instead, backfired.  Ceresney's confidence that his connections within the SEC led to a lower level of attention to the review of documents transferred to the SEC. This resulted in catastrophic damages to Collector's Coffee and Kontilai.

181.    Even when on or about August 1, 2018, the fact of Holt's recreating old documents came to light, Ceresney's conflict led to his developing a scheme, alongside Brockner and Mhatre, to delay and mislead the SEC with his overreliance that on the day of signing the settlement it would be overlooked and forgiven by the SEC officers in charge of the settlement talks.

182.    Instead, Ceresney's conflict of interest with the SEC and his overreliance on his connections led to catastrophic results for Plaintiffs. Those consequences could have been avoided if Debevoise & Plimpton reported promptly on or after August 1, 2018, when such documents' recreation from Holt was discovered and would have taken remedial measures. Instead, Ceresney took a lead in his firm's alleged unethical and illegal conduct in bad faith.

183.    The motive for such a clear disregard of the prohibitions under the Uniform Rules of Professional Conduct (Rules 1.7 and 1.8), was pure greed and seeking pecuniary gain when a law firm and its partner weighed monetary considerations above their professional duties. As

mentioned above, Debevoise & Plimpton continued to issue billing yet more, for over 2 months, for hundreds of thousands of dollars, despite the obligation to immediately mitigate liability.

184.    Plaintiffs are entitled to relief through compensatory and punitive damages based on malpractice, conflict of interest, unethical and illegal conduct as shown above.

### COUNT III. NEGLIGENCE (MALPRACTICE, PROMISING ASSURED FAVORABLE RESULTS OF REPRESENTATION).
### (Against Defendants Debevoise & Plimpton and Ceresney)

185.    Plaintiffs incorporate by reference the allegations in preceding Paragraphs 1-166 and 167-168 (elements and causation), with the same force as though repled again.

186.    From the first conference that Plaintiffs had with Debevoise & Plimpton on or about December 20, 2017, and through the execution of the Engagement Letter on January 10, 2018, Ceresney, on behalf of Debevoise & Plimpton made repeated promises that they will have the SEC inquiry resolved within 6 months, with the favorable outcome.

187.    Ceresney made such promises and statements on repeated occasions before Kontilai and witnesses Sagalow, Heim, and Hutchison.  Ceresney repeatedly promised that he was to resolve all with his former subordinates at the SEC, which justified the exceptionally high invoices from Debevoise & Plimpton.  However, such promises of the outcome are outlawed by the Uniform Rules of Professional Conduct and the applicable case law.

188.    Plaintiffs are entitled to relief, compensatory and punitive damages based on the damages suffered due to these Defendants' improper promises, assurances, and statements.

### COUNT IV.  NEGLIGENCE (MALPRACTICE, FAILURE TO REVIEW DOCUMENTS PRIOR TO PRODUCING THOSE TO THE SEC AS ORIGINALS).
### (Against Defendants Debevoise & Plimpton, Ceresney, Brockner and Mhatre)

189.    Plaintiffs incorporate by reference the allegations in preceding Paragraphs 1-166 and 167-168 (elements and causation), with the same force as though repled again.

190.    From the first conference that Plaintiffs had with Debevoise & Plimpton on or about December 20, 2017, and through the execution of the Engagement Letter on January 10, 2018, Ceresney and Debevoise & Plimpton made it clear that they had excellent contacts at the highest levels of the SEC, Ceresney's former employer, and that he was confident that he could achieve a quick settlement within 6 months.

191.    The assertions by Ceresney, of Debevoise & Plimpton, that they had some special or exclusive treatment at the SEC was implied as a justification of the extraordinary hourly rate billed by Ceresney personally ($1,300/hr) and by his associates at the law firm.

192.    As a result of Debevoise & Plimpton's using implied leverage of connections at SEC, that firm's invoices from January to October of 2018 amounted to over $3 million.

193.    However, Ceresney's connections with the SEC, instead, backfired.  Ceresney's confidence that his connections within the SEC led to a lower level of attention to the review of documents transferred to the SEC. This resulted in catastrophic damages to Collector's Coffee and Kontilai.

194.    Even when on or about August 1, 2018, the fact of Holt's recreating old documents came to light, Ceresney's conflict led to his developing a scheme to delay and mislead the SEC with his overreliance that on the day of signing the settlement it would be overlooked and forgiven by the SEC officers in charge of the settlement talks.

195.    Instead, Ceresney's conflict of interest with the SEC and his overreliance on his connections led to catastrophic results for Plaintiffs. Those consequences could have been avoided if Debevoise & Plimpton reported promptly on or after August 1, 2018, when such documents' recreation from Holt was discovered and would have taken remedial measures. Instead, Ceresney took the lead alongside Brockner and Mhatre, in his firm's alleged unethical and illegal conduct in bad faith.

196.     The motive for such a clear disregard of the prohibitions under the Uniform Rules of Professional Conduct (Rules 1.7 and 1.8), was pure greed and seeking pecuniary gain when a law firm and its partner weighed monetary considerations above their professional duties. As mentioned above, Debevoise & Plimpton continued to issue billing yet more, for over 2 months, for hundreds of thousands of dollars, despite the firm's obligation to immediately mitigate liability.

197.     Plaintiffs are entitled to relief through compensatory and punitive damages based on malpractice, for negligent, unethical, and illegal conduct as shown above.

## COUNT V.  BREACH OF CONTRACT (MALPRACTICE).
### (Against All Defendants)

198.     Plaintiffs incorporate by reference the allegations in preceding Paragraphs 1-166 and 167-168 (elements and causation), with the same force as though re-pled again.

199.     The Engagement Letter of January 10, 2018, represented a contract. See Exh. 1. Plaintiffs and Debevoise & Plimpton entered in privity of contract. Defendants breached that contract on numerous occasions.

200.     For example, Defendants' breach culminated on May 14, 2018, when Ceresney, Brockner, Mhatre, and Debevoise & Plimpton forwarded the package of documents to the SEC's office in Denver, without likely even reviewing the contents.

201.     As shown above, Debevoise & Plimpton and Ceresney, Brockner, and Mhatre acting according to the Engagement Letter acted in breach of their obligations under it, committed numerous acts of malpractice that had catastrophic results for their clients, in breach of contract.

202.     Plaintiffs seek compensatory and punitive damages based on Defendants' willful breach of contract.

## COUNT VI.  BREACH OF FIDUCIARY DUTIES (MALPRACTICE).
### (Against All Defendants)

203.    Plaintiffs incorporate by reference the allegations in preceding Paragraphs 1-166 and 167-168 (elements and causation), with the same force as though re-pled again and further state as follows.

204.    That Count is stated in supplementation of the above Counts stated for malpractice to the extent breach of fiduciary duties goes beyond legal malpractice.

205.    Under the Engagement Letter of January 10, 2018, Plaintiffs and Debevoise & Plimpton entered in privity of contract.  As one of the effects of that privity was that Debevoise & Plimpton was to have fiduciary duties to their clients.

206.    Such breach culminated on May 14, 2018, when Ceresney, Brockner and Mhatre and Debevoise & Plimpton forwarded the package of documents to the SEC's office in Denver, without reviewing the contents.

207.    As shown above, Debevoise & Plimpton, Ceresney, Brockner, and Mhatre committed numerous acts of malpractice that caused catastrophic results for their clients, in breach of their fiduciary duties.

208.    Plaintiffs seek compensatory and punitive damages based on Defendants' breach of fiduciary duties.

## COUNT VII.  FRAUDULENT CONCEALMENT (MALPRACTICE).
### (Against All Defendants).

209.    Plaintiffs incorporate by reference the allegations in preceding Paragraphs 1-166 and 167-168 (elements and causation), with the same force as though re-pled again and further state as follows.

210.    As mentioned above, on August 1, 2018, Ceresney, Brockner, and Mhatre and Debevoise & Plimpton discovered, that the documents that Holt had sent to New York on May

14, 2018, were not original. Without apparently reviewing those, Debevoise & Plimpton and Ceresney, Brockner, and Mhatre merely forwarded those to the SEC's office in Denver, on the eve of questioning Kontilai.

211.    From August 1, 2018, to about October 17, 2018, Ceresney, Brockner. and Mhatre and Debevoise & Plimpton intentionally failed or refused to disclose to the federal agency the SEC exactly what happened with the documents from Holt, that they were not the original sets from 2007 and that Holt admitted to acting alone. This misinformation, resulted in Collector's Coffee and more importantly Kontilai, being a target in both a civil lawsuit and criminal investigation.

212.    In addition to that culmination of fraudulent concealment, falling, inter alia under 18 U.S.C. Sec 1512, Debevoise & Plimpton intentionally strategized on disclosing it only on the day of the anticipated execution of a settlement agreement.  Such a strategy of concealment from a federal agency, the SEC, resulted in catastrophic results for Collector's Coffee and Kontilai.

213.    Plaintiffs are entitled to relief under the cause of action of both compensatory and punitive damages for fraudulent concealment.

### COUNT VIII.  FRAUD (MALPRACTICE).
### (Against All Defendants).

214.    Plaintiffs incorporate by reference the allegations in preceding Paragraphs 1-166 and 167-168 (elements and causation), with the same force as though repled again.

215.    As mentioned above, on August 1, 2018, Ceresney, Brockner, Mhatre, and Debevoise & Plimpton discovered, belatedly, that the documents that Holt had sent to New York on May 14, 2018, were not original sets. Debevoise & Plimpton and Ceresney, Brockner, and

Mhatre merely forwarded those to the SEC's office in Denver, on the eve of questioning Kontilai, on information and belief, without reviewing those documents as was their duty.

216.    From August 1 to about October 17, 2018, Ceresney, Brockner, and Mhatre and Debevoise & Plimpton intentionally participated in a fraudulent scheme to cover up for the fact that the produced documents were not the original sets from 2007 from the SEC, but were produced as such. This scheme was implemented by Debevoise & Plimpton and Ceresney, Brockner, and Mhatre to avoid responsibility for malpractice and to preserve their reputation at the expense of destroying Collector's Coffee and ruining Kontilai.

217.    Instead of resigning or immediate disclosure to the SEC, Debevoise & Plimpton Ceresney, Brockner and Mhatre implemented a scheme on disclosing it only on the day of the anticipated execution of a settlement agreement.   Such a strategy of concealment from a federal agency, the SEC, resulted in catastrophic results for Collector's Coffee and Kontilai.

218.    Plaintiffs are entitled to relief for both compensatory and punitive damages under the cause of action of fraud.

### COUNT X.  MISREPRESENTATION (MALPRACTICE).
### (Against Defendants Debevoise & Plimpton and Ceresney)

219.    Plaintiffs incorporate by reference the allegations in preceding Paragraphs 1-166 and 167-168 (elements and causation), with the same force as though re-pled again.

220.    Starting from the first conference on or about December 20, 2017, Ceresney and Debevoise & Plimpton told on numerous occasions Kontilai and Collector's Coffee that they had leverage within the SEC's staff and that they could count on a favorable treatment of their issues at the SEC. Defendants also implied that these inside relationships with high-level officials at the SEC justified extraordinary rates that they would charge for their services.

221.    Instead of favorable treatment and overreliance by Ceresney on his connections, their acts resulted in an extraordinary disaster for Collector's Coffee and Kontilai. The corporation was ruined and Kontilai's personal life got essentially destroyed.

222.    Plaintiffs are entitled to relief and both compensatory and punitive damages based on misrepresentation.

## COUNT XI. COURT-ORDERED INSPECTION.
### (Against Defendants Debevoise & Plimpton, Ceresney, and Brockner)

223.    Plaintiffs incorporate by reference the allegations in preceding Paragraphs 1-166, with the same force as though re-pled again and further state as follows.

224.    As mentioned above, Debevoise & Plimpton issued to Plaintiffs invoices for over $3 million, covering only less than 10 months.

225.    Given the results of Debevoise & Plimpton's representation, Plaintiff's insurance carrier stopped paying their bills including for a transfer of the client file to Plaintiffs.

226.    As a result, most documents under the control of Debevoise & Plimpton, arising from their representation of Collector's Coffee and Kontilai have remained out of reach of Plaintiffs until just recently by Court stipulated order.

227.    Plaintiffs are entitled to a Court Order, directing Debevoise & Plimpton, Ceresney, Brockner, and Mhatre to allow inspection of all documents under their control, arising from representing Plaintiffs, to be inspected.

## COUNT XII. ACCOUNTING.
### (Against Defendants Debevoise & Plimpton, Ceresney, Brockner, and Mhatre).

228.    Plaintiffs incorporate by reference the allegations in preceding Paragraphs 1-166, with the same force as though re-pled again and further state as follows.

229.    As mentioned above, Debevoise & Plimpton issued to Plaintiffs invoices for over $3 million, covering only less than 10 months.

230.    The invoices were excessive and overstated.  The invoices, for which Debevoise & Plimpton was paid, missed, in a substantial portion, a proper justification for what the charge was made.

231.    That was particularly evident in the example of Ceresney.  Kontilai observed that Ceresney was extremely busy with other matters, with other clients, and he was rarely involved in services for Plaintiffs, instead of delegating most or nearly all work to associates and assistants.  However, Ceresney's invoices were exceptionally large, not in proportion to the time and commitment to the representation of Plaintiffs.

232.    Plaintiffs are entitled to a Court Order, directing Debevoise & Plimpton to provide further justification of numerous items on their invoices.

### COUNT XIII:  CIVIL CONSPIRACY (MALPRACTICE).
### (Against Defendants Debevoise & Plimpton, Ceresney, Brockner, Mhatre, and Does).

233.    Plaintiffs incorporate by reference the allegations in preceding Paragraphs 1-166 and 167-168 (elements and causation), with the same force as though re-pled again.

234.    On or about August 1, 2018, Debevoise & Plimpton and Ceresney, Broackner and Mhatre, discovered that the documents supplied by Holt on May 14, 2018, and transferred to the SEC without an inspection, were not originals from 2007.

235.    On that day or shortly thereafter, Ceresney, Brockner, Mhatre, and Debevoise & Plimpton entered into an illegal agreement not to disclose that occurrence to the SEC, which conduct fell under 18 U.S.C. Sec. 1512 and other law.  Other than these four parties, Plaintiffs are unaware who else entered that illegal agreement, representing a civil conspiracy.

236.    Kontilai and Collector's Coffee were not involved in that alleged criminal conspiracy, they were never asked to approve it or to do anything about it.  Additionally, only

Debevoise & Plimpton as the counsel of record only were allowed to communicate with the SEC's office in Denver, Colorado, at the time.

237.    As a result of that alleged criminal conspiracy, the Corporation, Collector's Coffee was destroyed, and Kontilai's life was ruined for all purposes, leaving him without sources of income overseas, without a home.

238.    Plaintiffs assert a claim based on civil conspiracy and ask for both compensatory and punitive damages against Defendants.

## COUNT XIV.  INJUNCTIVE RELIEF.
### (Against Defendants Debevoise & Plimpton and Ceresney, Brockner and Mhatre)

239.    Plaintiffs incorporate by reference the allegations in preceding Paragraphs 1-166, with the same force as though re-pled again and further state as follows.

240.    As mentioned above, on or about January 3, 2019, Debevoise & Plimpton and Ceresney, were subpoenaed by the SEC, requiring them to disclose the documents that are covered by the attorney-client privilege.

241.    As evidence shows, Defendants indeed disclosed the privileged documents to the SEC, even without alerting their former clients, Collector's Coffee and Kontilai.

242.    Plaintiffs seek relief of an Order to Debevoise & Plimpton prohibiting them from disclosing privileged documents to the SEC, protected by the attorney-client privilege.  Additionally, Plaintiffs seek an Order prohibiting Ceresney and/or Debevoise & Plimpton to provide any oral testimony of substance harmful to Plaintiffs.

243.    Unless such Order, granting injunctive relief, is issued, Plaintiffs will face further catastrophic consequences, as a selective disclosure of privileged documents may lead to further damages, criminal liability, even though Kontilai was innocent at all times.

244.    Plaintiffs are entitled to injunctive relief.

**WHEREFORE**, Plaintiffs seek the following relief:

a.    Compensatory and punitive damages on all Counts where damages are allowed, considering the estimates of the market value of the Corporation exceeding $100 million, which market value was destroyed through the malpractice of Defendants;

b.    Forfeiture and return of all legal fees received by Defendants, in the amount of over $3 million;

c.    In addition to direct damages, any other damages, to the full extent as allowed by the applicable law;

d.    Injunctive relief;

e.    Orders allowing inspection of documents and accounting;

f.    Attorney's fees and costs where allowed by the applicable law;

g.    Such other and further relief as the Court deems just and fair.


## DEMAND FOR JURY TRIAL

Plaintiffs demand jury trial on all Counts that are allowed to be tried by a jury.

Dated: October 14, 2020.   Respectfully submitted,

_____
George Lambert, Esq.
D.C. bar #979327
The Lambert Law Firm
1025 Connecticut Ave., #1000 NW
Washington, D.C., 20036
Tel. (202) 640 1897, Fax (800) 952 1950
Email: LawDC10@gmail.com

## VERIFICATION OF COMPLAINT

I, Mykalai Kontilai, acting for Collector's Coffee Inc., a Nevada corporation, as its President and Chief Executive Officer, and acting as an individual, as well as a majority shareholder in the said corporation, state and affirm under the penalties of perjury under the law of the United States, that the facts alleged in the Complaint are true and correct to the best of my knowledge.

DocuSigned by:

*Mykalai Kontilai*

68C849AA86B6443...

Mykalai Kontilai

Date: October 14, 2020

# EXHIBIT  1

**Debevoise
& Plimpton**

Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022
+1 212 909 6000

**PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
ATTORNEY-CLIENT COMMUNICATION**

January 10, 2018

Mykalai Kontilai
President and Chief Executive Officer
Collector's Coffee, Inc.
3565 Las Vegas Blvd South #337
Las Vegas, Nevada 89109

Dear Mr. Kontilai:

We are very pleased that you have decided to engage Debevoise &
Plimpton LLP to represent Collector's Coffee, Inc. (the "Company") in
connection with an investigation being conducted by the U.S. Securities and
Exchange Commission (the "Investigation"). This will confirm the terms of our
engagement and our billing arrangements for our work for the Company.

1. Scope of Engagement

You have engaged us to represent the Company in connection with the
Investigation. If additional services are requested by you and agreed to by us, this
letter will also apply to such services, unless superseded by another written
engagement letter. Our representation is limited to the services that you request
and we agree to perform on your behalf.

2. Staffing

We staff matters with the goal of providing legal services of the highest
quality on the most cost-effective basis possible. In the interest of efficiency, we
will draw upon the talents and experience of lawyers throughout our firm.

As we discussed, I will lead the firm's work on this matter. The number of
additional attorneys and support personnel working on this matter may vary
according to the scope and demands of the Investigation. I will be happy to
discuss project management and staffing matters with you at any time.

Mykalai Kontilai                    2                    January 10, 2018

3.  Billing Policies and Procedures

  Our fees for our services will be based upon our customary hourly rates for matters of this kind.  Our current hourly rates for this matter range from $535 per hour for our newest associates to $1,500 per hour for our most experienced partners.  My current rate is $1,500 per hour.  Rates for project assistants, legal assistants and other support personnel range from $215 per hour to $440 per hour. These rates are subject to adjustment by the firm from time to time.

  The firm will also bill the Company for disbursements and other charges that we incur on the Company's behalf.  These disbursements and charges may include, among others, filing fees and fees and expenses related to court reporters, transcripts, expert witnesses, document retrieval services, travel, postage and express deliveries, and local and other counsel (where appropriate); and charges for long distance telephone, teleconferencing, telecopier, messenger services, document preparation (including word processing and duplicating), computer use, Westlaw™, LEXIS™ and other database services, and certain overtime and administrative expenses.  If an out-of-pocket expense is significant, we may ask you to pay the provider directly upon receipt of the applicable invoice.

  The retainer amount of $75,000 will be applied to the first $75,000 incurred in fees and costs.  We understand that the rest of our fees and expenses will be covered by insurance.  If insurance does not cover any fees or expenses, the Company will be responsible for those fees and expenses.

4.  Conflicts

  We will be representing the Company solely in connection with the Investigation.  We have performed a conflict check using our records management system.  Based on that check, we are not aware of any conflicts of interest in undertaking this representation.

  However, as you are aware, our firm represents many other companies and individuals.  It is possible that during the time we are representing the Company, some of our present or future clients will have disputes or transactions with or involving the Company.  We consider it our ethical obligation to remain alert to the possibility of conflicts and to alert you and take appropriate action if we conclude that any such conflict exists.  In light of the foregoing, we wish to clarify, and confirm your agreement, that our representation of the Company will not prevent us from representing existing or new clients that may have interests adverse to the Company, so long as the matter for the other client is neither substantially related to our work for you nor a litigation against the Company.

  We agree that your consent to and waiver of conflicting representations in the preceding paragraphs do not permit us, without your prior consent, to disclose to another client confidential information of a nonpublic nature about the

Mykalai Kontilai                    3                    January 10, 2018

Company obtained in the course of our representation of the Company that could be used in the other matter by the other client to your detriment.

5. Disposition of Files

Once our engagement in this matter ends, you may direct us to return, retain or discard some or all of the documents pertaining to the engagement. If we send you written notice advising you that this engagement has concluded and you do not respond within 60 days, you understand and agree that any materials left with us may thereafter be retained or destroyed at our discretion. Notwithstanding the foregoing, and unless you instruct us otherwise, we will return and/or preserve any documents we believe you will need to retain to enforce your rights or to bring or defend claims. "Materials" include paper files, as well as information stored in other forms, including email, audio and video recordings and file materials in other formats. We reserve the right to make, at our expense, copies of all documents generated or received by us in the course of our representation. If you request copies of documents from us, copies that we generate will be made at your expense. We will maintain the confidentiality of all documents throughout this process.

Our own files pertaining to this matter will be retained by the firm (as opposed to being sent to you) or destroyed. These firm files include, for example, firm administrative records, time and expense reports, personnel and staffing materials, and accounting records. For various reasons, including the minimization of unnecessary storage expenses, we reserve the right to destroy or otherwise dispose of any documents or other materials retained by us within a reasonable time after the termination of this engagement.

6. Governing Law; Dispute Resolution

This letter and any matters relating to or arising directly or indirectly out of our relationship with you shall be governed by and construed in accordance with the laws of the State of New York.

If a dispute arises as to the amount of the fee being charged, you may have the right to seek arbitration or mediation of the fee dispute under a procedure established in New York State for resolution of certain fee disputes pursuant to Part 137 of the Chief Administrator Rules. We will provide you with the necessary information regarding such processes in the event of a dispute, or at any time upon request.

Except to the extent otherwise required by such Chief Administrator Rules, any dispute or claim arising out of or in any way relating to our representation of you (including, without limitation, any claim of malpractice, breach of contract or relating to fees or charges for the representation) shall be finally settled by arbitration, and judgment upon the award may be entered by any

Mykalai Kontilai                              4                          January 10, 2018

court having jurisdiction thereof or having jurisdiction over the relevant party or
its assets. The arbitration shall be conducted in accordance with the International
Institute for Conflict Prevention and Resolution ("CPR") Rules for Non-
Administered Arbitration in effect at the time of the arbitration, except as they
may be modified herein or by mutual agreement of our firm and you (collectively,
the "parties"). The seat of the arbitration shall be New York, New York and it
shall be conducted in the English language. The arbitration shall be conducted by
one arbitrator, and the parties agree to seek to reach agreement on the identity of
the sole arbitrator within 30 days after the initiation of the arbitration. If the
parties are unable to reach agreement on the sole arbitrator, then the appointment
of the sole arbitrator shall be made by CPR. The parties agree that the arbitration
shall be kept confidential and that the existence of the proceeding and any element
of it shall not be disclosed beyond the tribunal, the parties and their counsel, and
any person necessary to the conduct of the proceeding. The confidentiality
obligations shall not apply if disclosure is required by law or in judicial or
administrative proceedings, or as far as disclosure is necessary to enforce the
rights arising out of the award. This agreement to arbitrate shall constitute an
irrevocable waiver of each party's right to a trial by jury, discovery that would
customarily be available in a judicial proceeding, and appeal, but the arbitrator
shall have the power to grant any remedy for money damages or equitable relief
that would be available to such party in a dispute before a court of law in New
York.

                              *         *         *

        Above all, our relationship with you must be based on trust, confidence
and clear understanding. If you have any questions about this letter or about any
aspect of the work that the firm, or any of the firm's lawyers, is performing for the
Company, please call me directly to discuss the matter. We encourage you to
inquire about any matter concerning the attorney-client relationship that is in any
way unclear or unsatisfactory. You may, of course, terminate our representation
at any time for any reason. Subject to ethical obligations, we reserve the right to
withdraw from an engagement if our statements are not being paid in a timely
manner or if for any other reason the lawyer-client relationship is not proceeding
in a satisfactory manner.

        Any work that we perform for the Company will be based on the
understandings set forth in this letter, so please let me know immediately if this
letter does not correctly set forth our agreement. Please also confirm such
agreement by countersigning a copy of this letter in the space provided below and
returning such countersigned copy to me.

Mykalai Kontilai                          5                      January 10, 2018

     We invite you to consult with us at any time and on any topic.  We look
forward to working with you.

                            Very truly yours,

                            Andrew J. Ceresney

ACCEPTED AND AGREED:

_____
Collector's Coffee, Inc.

_____
Date